UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIRIAM GOLDBERG, | Case No.  24-cv-04525-LJC |
| Plaintiff, | |
| v. | **ORDER DENYING MOTION TO STRIKE** |
| TEACHBK, INC., et al., | Re: Dkt. No. 28 |
| Defendants. | |

## I.      INTRODUCTION

Pending before the Court is a special Motion to Strike Plaintiff Miriam Goldberg's Complaint filed by Defendants Ilya Kiselev, Andrei Burtsev, and TeachBK, Inc. ECF No. 28. Defendants bring their motion pursuant to California law permitting the pre-trial dismissal of Strategic Lawsuits Against Public Participation ("SLAPPs"), that is, lawsuits "intended to deter ordinary people from exercising their political or legal rights or to punish them for doing so." *Makaeff v. Trump University, LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (citations omitted). A hearing was held on November 12, 2024. Having considered the briefing and arguments, the Court **DENIES** Defendants' Motion to Strike to the extent it challenges the legal sufficiency of Plaintiff's Complaint.[1]

## II.      BACKGROUND

### A.      Allegations in Plaintiff's Complaint

Plaintiff Miriam Goldberg, professionally known as Marina Sokolovskaya, is the development director and intake manager for Modern Law Group, a U.S.-based immigration law

---

[1] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

firm. ECF No. 1 (Compl.) ¶ 2.[2] Goldberg is a Russian émigré who came to the United States because of her opposition to Russian President Vladimir Putin, and she has since become a naturalized U.S. citizen. *Id.* She works with asylum seekers from former Soviet republics, including Russians facing persecution for opposing the Russian government and the war in Ukraine. *Id.* Her job responsibilities include posting "YouTube videos and Instagram posts and reels discussing immigration matters based on topics decided by her employer." *Id.* Apart from her job at Modern Law Group, Goldberg volunteers to help locate missing persons and has made a documentary about this volunteer work. *Id.*

Defendants Ilya Kiselev and Andrei Burtsev "run and administer (1) the YouTube channel 'TeachBK – Immigration' located at https://ww.youtube.com/@TeachBK […], (2) various Telegram channels, and (3) the website teachbk.com, on which they offer help to Russians who are seeking to move to the United States." Compl. ¶ 5. Defendants' website "provides information on travel to Mexico, purchasing vehicles, preparing for asylum interviews, and recommendations to the two U.S.-based immigration lawyers who often appear on [their] YouTube Channel." *Id.* Kiselev and Burtsev "incorporated this venture as TeachBK, Inc.," and are TeachBK's "sole owners and shareholders." *Id.* ¶¶ 5-6. Defendants' YouTube channel alone has over 100,000 subscribers. *Id.* ¶ 14.

At some point during or prior to January 2023, Goldberg posted on one of Defendants' Telegram channels warning their subscribers not to buy fake immigration documents. Compl. ¶ 17. Defendants then began "posting attack videos" and "negative comments" about Goldberg on their social media channels. *Id.* Goldberg's employer contacted Defendants and requested that they stop posting videos. *Id.* They briefly complied, and then resumed posting negative content regarding Goldberg. *Id.* ¶ 18. "Around eight months after the attacks began, and after Kiselev threatened" Goldberg with sexual violence on Facebook, Goldberg, deciding to "personally take action" against Defendants, researched Kiselev online and learned that he was involved in various

---

[2] For purposes of ruling on this motion, the Court accepts Goldberg's allegations as if true. Nothing in this summary should be construed as resolving any issue of fact that might be disputed.

legal disputes in Russia. *Id.* She learned that he was being sued for defamation in Russia by Valeriy Katkov, a Russian former municipal deputy. *Id.* In September 2023, Goldberg contacted Katkov to learn about his lawsuit against Kiselev. *Id.* ¶¶ 18, 19. Goldberg alleges that Katkov was a supporter of Aleksey Navalny and that at the time she contacted him, he no longer worked for the Russian government. *Id.*

Defendants learned that Goldberg had contacted Katkov and began posting content on their social media channels claiming Goldberg was a Russian agent who was sending her office's clients' personal information to the Russian government. *Id.* ¶¶ 19-20. Goldberg claims that Defendants posted the following defamatory statements on their social media channels:

### 1. September 7, 2023 Video

Defendants posted a video to the TeachBK YouTube channel on September 7, 2023 falsely claiming Goldberg is "an agent of the Russian government who leaks information from prospective clients to the Russian Federation government apparatus." *Id.* ¶ 20. The video's cover photo depicts an image of Goldberg making a hand signal that signifies "murder" in Russia, next to an image of Vladimir Putin with his finger to his lips. *Id.* ¶ 22. The TeachBK YouTube channel and the TeachBK website include a summary of the video, stating:

> Marina Sokolovskaya leaks personal data to a Russian deputy, who in turn is directly connected with Russia's security agencies. What case is currently being discussed in Russia, and who knows about it besides Marina and the intelligence services she works with? How ethical is it for Marina, who holds status in the US, to work with the authorities of a country she opposes? And how safe is it for those who come to America seeking political asylum? On what terms does Marina Sokolovskaya cooperate with Rubic in the US (Ekaterina Panova, Rubic.us)?[3]

*Id.* ¶ 24. In the video itself, a full translation of which is attached in its entirety to the Complaint at Exhibit 1, Kiselev makes the following statements about Plaintiff:

> [G]iven that this person runs an immigration channel, calls herself an immigration consultant […] communicates with you, takes your

---

[3] Ekaterina Panova is allegedly the "owner of a Ukrainian news publication," Rubic, that is currently being sued by Aleksey Tovarian, a lawyer associated with Defendants, in an action in the Southern District of Florida. Compl. ¶ 42; *see Tovarian v. Rubic, LLC*, No. 24-cv-14037 (S.D. Fla.). She is referred to as both "Ekaterina Panova," and "Kateryna Panova." Compl. ¶ 42; ECF No. 31 at 8.

United States District Court
Northern District of California

contact details […] Where do these contact details go later? Where does the essence of the cases you see go, to which Russian authorities? Is it normal for a Russian citizen, being in the United States and working for an American attorney at the Modern Law Group, to receive protection from the American government and then provide personal data to the Russian authorities about people who immigrate to the United States?

*Id.* ¶ 25. Burtsev responds:

[W]hat kind of conspiracy could there be, what kind of contract conditions could there be, that is, what other immigrants could [Marina Sokolovskaya] she be sending there? Maybe it's all a streamlined situation where they say, Listen, we will help you, but you must provide information about everyone you find and know—people of interest, and maybe even call them by name—when they come to you, let us know, and we'll see if we are interested in this person or not. Oh, here's an interesting person! Oh, here's their case! Here's their face. When does he come to you? Oh, he has a bad case, right? Tell him his case is bad, and we will deport him. And we are waiting for him here.

*Id.* ¶ 26.  Later in the video, Kiselev, commenting about Goldberg's communication with Katkov, states:

[T]here is some connection between Marina Sokolovskaya and the current Russian authorities, where there is a channel through which information goes in both directions. It means that the phone is answered, listened to, and then hung up. It means the phone is not thrown away when Sokolovskaya calls from the U.S. to Russia […] I have a huge request to the FBI, CIA, foreign intelligence, and domestic intelligence of both countries to pay attention to this lady. How she violates all personal data laws, international and others, leaking all the information to a hostile state of one country or another? Maybe she is a double agent.

*Id.* ¶¶ 29-30; *id.* at 25-26. Burtsev responds:

[I]t turns out that there is a person in the U.S. who collaborates as an infiltrated agent from Russia and transmits this data [information from asylees] and also tries to influence the situation in such a way that the people whom the U.S. is protecting now should be deported. Maybe they want to collect some additional data to use it elsewhere for a different purpose.

*Id.* ¶ 38. The September 23, 2023 video has been viewed by "almost 8,000 people." *Id.* ¶ 40.

### 2.    March 15, 2024 Video

Defendants posted another video on March 15, 2024, the summary of which states that Plaintiff and Ekaterina Panova were part of a "major espionage network" that the FBI was investigating. *Id.* ¶ 48 n.2. A full translation of this video is not included in the Complaint.

### 3.    May 18, 2024 Video

Defendants posted an additional video in May 2024 titled "US citizens work with Moscow / The Kremlin is online" on TeachBK's YouTube channel. *Id.* ¶¶ 41-42. The video includes a "doctored photo" of Goldberg and Ekaterina Panova in Russian military uniform above text stating "U.S. citizens are leaking information about Russians." *Id.* ¶ 42. A full translated transcript of the video is attached to the Complaint. *Id.* at 26. Defendant Kiselev, discussing Goldberg's alleged connection with the Russian government, states:

> The question is how Marina Sokolovskaya, a US citizen, has such a close connection with the Kuzminsky Court in Moscow. Despite the fact that in her social networks she is clearly not a pro-Russian person. She is a person who severely criticizes Russia, calling it "Rashka," calling everyone "Russcists," […] But at the same time, she has a direct connection with a deputy from Moscow. Connections with "Rubic" connections with Kharitonov from Great Britain, they are all involved in some shady business, selling something to someone, to poor immigrants, while using pseudonyms, and not even their real names.

*Id.* at 33. Burtsev then states:

> [H]ow do Marina Sokolovskaya and Ms. Ekaterina Panova have direct access to the country's leadership in the form of deputies and pro-Russian media in Moscow?

*Id.*; *id.* ¶ 52.  Kiselev, apparently warning his subscribers against using Goldberg's immigration services, adds:

> As for Marina Sokolovskaya […] and all these wonderful friends, these guys are engaged in specific criminal activities. They clearly understand what they are doing and how they are doing it. Moreover, we have complete evidence that Marina Sokolovskaya, who is not Marina Sokolovskaya, and Ekaterina Panova have a clear connection with Russia today. And they use this connection for communication, both ways. And before you engage in immigration, before you turn to these wonderful people, you need to think very carefully about where your information might surface at any given moment. And what consequences this might have for you.

*Id.* at 34. The May video has been viewed by over 6,000 people. *Id.* ¶ 53.

### 4.    Additional Statements on Social Media

In addition to the three videos described above, Defendants have made remarks about Goldberg on social media, including an Instagram post stating that Goldberg is part of "a unified and connected fraudulent scheme to send the personal information of asylum seekers to

United States District Court
Northern District of California

Moscow." *Id.* ¶¶ 48-49.

### 5. Plaintiff Disputes the Truth of Defendants' Statements and Alleges that Kiselev knew that the Statements Were False

Goldberg asserts that she is neither a Russian spy nor agent. *Id.* ¶ 44. Further, she denies that she is affiliated with the Russian government and alleges that she "maintains no contacts with the Russian government or any of its agents," and "has not shared any information about any person to the Russian government." *Id.* ¶¶ 44-45. She alleges that Defendants knew the statements made on their social media channels to thousands of followers were false and injurious, and made them to "bolster" their business. *Id.* ¶ 62. She asserts that Kiselev knew that Katkov ceased working for the Russian government by August 2022 and that he was not affiliated with the Russian government by the time she contacted Katkov in September 2023. *Id.* ¶¶ 32, 35, 37. She alleges that Defendants' statements about her "resulted in hate mail and negative comments online," lost her law firm clients, and caused her "emotional and reputational harm[.]" *Id.* ¶¶ 62-63, 81.

### B. Procedural History

Goldberg sued Defendants for defamation *per se* and *per quod* on July 26, 2024. Compl. at 1. Defendants filed the instant anti-SLAPP Motion to Strike Plaintiff's Complaint, claiming that the lawsuit is "aimed at chilling Defendants' right of petition or free speech in connection with issues relating to immigration, asylum, and related litigation." ECF No. 28 at 9. With their motion, Defendants filed declarations by Kiselev, Burtsev, defense counsel Alla Vorobets, and Pavel Ledestimminov, a Russian asylee who attests that Goldberg shared his personal information online without permission. ECF Nos. 28-1, 28-2, 28-3, 28-4. The declarations attest to Goldberg's role as a blogger and journalist with over 30,000 followers on social media and characterize Katkov as a "pro-Putin Russian politician" who, while no longer holding an official political position, still has "political connections to the present Russian government" and "remains an integral part of the pro-Putin propaganda machine." ECF Nos. 28-4 ¶¶ 8-9, 11; 28-2 ¶ 26; 28-1 ¶¶ 5-6.

In spite of the filed declarations, at the hearing, Defendants informed the Court that their anti-SLAPP Motion challenges the legal sufficiency of Goldberg's claims only, and therefore they

conceded that this Court could not consider such evidence in ruling on the motion. Defendants

conceded that at this stage in the proceedings, given that they had not conducted discovery, the

Court may only consider the allegations in the Complaint to resolve such a motion. The legal

standard that applies to this motion, which is set forth below, makes clear that Defendants made

sound concessions.

## III.    LEGAL STANDARD

"California law provides for the pre-trial dismissal of certain actions, known as Strategic

Lawsuits Against Public Participation, or SLAPPs, that masquerade as ordinary lawsuits but are

intended to deter ordinary people from exercising their political or legal rights or to punish them

for doing so." *Makaeff*, 715 F.3d at 261 (citations omitted). The Ninth Circuit has held that aspects

of California's anti-SLAPP statute, specifically the availability of the special motion to strike and

"the availability of fees and costs," apply in federal diversity actions. *CoreCivic, Inc. v. Candide

Group, LLC*, 56 F.4th 1136, 1143 (9th Cir. 2022); *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832,

846 (9th Cir. 2001).

California's anti-SLAPP statute establishes:

> A cause of action against a person arising from any act of that person
> in furtherance of that person's right of petition or free speech under
> the United States or California Constitution in connection with a
> public issue shall be subject to a special motion to strike, unless the
> court determines that the plaintiff has established that there is a
> probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code §425.16(b)(1). Applying section 425.16(b)(1), courts employ a two-step test

in evaluating whether to grant a defendant's anti-SLAPP motion. First, the moving defendant must

make a "prima facie showing that the plaintiff's suit arises from an act in furtherance of the

defendant's constitutional right to free speech." *Makaeff*, 715 F.3d at 261. "At step one, a court

primarily reviews the complaint, but also papers filed in opposition to the motion to the extent that

they might give meaning to the words in the complaint." *Mandel v. Hafermann*, 503 F. Supp. 3d

946, 960–61 (N.D. Cal. 2020) (citations omitted). If the court finds that the defendant has made a

prima facie showing that plaintiff's suit arises from conduct in furtherance of the defendant's free

speech rights, at the second step, the burden then shifts to the plaintiff "to establish a reasonable

United States District Court
Northern District of California

7

probability that it will prevail on its claim." *Makaeff*, 715 F.3d at 261.

In state court, a claim must be dismissed if the "plaintiff presents an insufficient legal basis for it, or if, on the basis of the facts shown by the plaintiff, 'no reasonable jury could find for the plaintiff.'" *Id.* (quoting *Metabolife v. Wornick*, 264 F.3d at 840). This approach, however, potentially runs afoul of the Federal Rules of Civil Procedure as it permits the dismissal of claims for factual insufficiency before discovery has been conducted. The Ninth Circuit, therefore, has crafted separate procedures for ruling on anti-SLAPP motions that challenge legal deficiencies of a claim and those that challenge factual deficiencies of a claim:

> [W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated. And, on the other hand, when an anti-SLAPP motion to strike challenges the factual sufficiency of a claim, then the Federal Rule of Civil Procedure 56 standard will apply. But in such a case, discovery must be allowed, with opportunities to supplement evidence based on the factual challenges, before any decision is made by the court. A contrary reading of these anti-SLAPP provisions would lead to the stark collision of the state rules of procedure with the governing Federal Rules of Civil Procedure while in a federal district court.

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018), *amended*, 897 F.3d 1224 (9th Cir. 2018).

"Under the familiar [Rule 12(b)(6)] plausibility pleading analysis, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face'" to survive an anti-SLAPP motion. *CoreCivic*, 46 F.4th at 1143 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). As for a 12(b)(6) motion, federal courts ruling on anti-SLAPP motions challenging the legal sufficiency of a claim "may consider the complaint in its entirety, as well as […] documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," but not other extrinsic evidence. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *see Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1155-56 (9th Cir. 2021).

## IV.    ANALYSIS

As noted above, at the hearing, Defendants informed the Court that the parties had not

1    conducted discovery and submitted their motion as challenging the legal sufficiency of the

2    Complaint only. The Court accordingly applies the 12(b)(6) standard in evaluating the sufficiency

3    of Goldberg's Complaint. The Court accepts Goldberg's well-pleaded allegations as true and

4    considers only the Complaint, attachments to the Complaint, and judicially noticeable information

5    when ruling on this motion. The Court does not consider the declarations Defendants and

6    Goldberg submitted in support of their briefing. Goldberg, for her part, does not dispute that

7    Defendants have made a prima facie showing that her suit arises from an act in furtherance of

8    Defendants' right to free speech. *See Makaeff*, 715 F.3d at 261; ECF No. 31 at 11 n.5. Thus, the

9    Court's analysis below focuses on the second step of the test. The Court analyzes whether

10   Goldberg alleges sufficient facts to state plausible claims for defamation *per se* and *per quod*. *See*

11   *CoreCivic*, 46 F.4th at 1143.

12          "Pursuant to California law, defamation involves the intentional publication of a statement

13   of fact which is false, unprivileged, and has a natural tendency to injure or which causes special

14   damage." *Herring*, 8 F.4th at 1157 (quotations omitted); *see Makaeff*, 715 F.3d at 264; *Taus v.*

15   *Loftus*, 40 Cal. 4th 683, 720, (2007) ("The tort of defamation involves (a) a publication that is (b)

16   false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that

17   causes special damage."). Statements are defamatory *per se* if the "defamatory meaning appears

18   from the language itself without the necessity of explanation[.]" *Todd v. Lovecruft*, No. 19-cv-

19   01751, 2020 WL 60199, at *15 (N.D. Cal. Jan. 6, 2020). Statements are defamatory *per quod*

20   when the "defamatory language [...] is not libelous on its face[;]" plaintiffs alleging defamation

21   *per quod* must prove and plead special damages. *Id.*; *see Barker v. Fox & Assocs.*, 240 Cal. App.

22   4th 333, 352 (2015). The allegedly defamatory statements must be "of and about" the party that

23   claims they have been defamed. *See Barger v. Playboy Enters.*, 564 F. Supp. 1151, 1153 (N.D.

24   Cal. 1983). When the plaintiff is a public figure, the plaintiff must also prove that the allegedly

25   defamatory statements were made with actual malice. *N.Y. Times v. Sullivan*, 376 U.S. 254, 280

26   (1964).

27          Defendants allege that Goldberg failed to state a claim for defamation because the

28   statements at issue are not of and concerning Goldberg exclusively; that the statements are

nonactionable opinion and conjecture rather than assertion of fact; that Goldberg is a public figure and thus must show Defendants acted with malice, which she cannot do; and that the statements are protected by the common interest privilege, fair report privilege, litigation privilege, and the *Noerr-Pennington* doctrine.[4]

### A.    The Allegedly Defamatory Statements Are "of and Concerning" Plaintiff

Defendants argue that Goldberg's action is based, in part, on claims that her employer Modern Law Group and her associate Ekaterina Panova were "effected by Defendants' alleged statements." ECF No. 28 at 27. Defendants request that the Court strike these claims as they are not "of and concerning" Goldberg. *Id.* It is not clear if Defendants are arguing that Goldberg claims Defendants made defamatory statements about the Modern Law Group and Panova or that the Modern Law Group and Panova were harmed by the statements Defendants made about Goldberg. *See id.* But either way, Defendants' argument is misplaced. To prevail in a defamation claim, a plaintiff must show that they were the "direct object of" the defamatory statement. *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1033 (1986) (explaining that this "specific reference requirements" prevents those "who merely complain of nonspecific statements that they believe cause them some hurt" from establishing a claim). A plaintiff cannot prevail when the defamatory statements are not "of or concerning" them. *Id.* Although the Complaint references statements Defendants made about both Goldberg and Panova (Compl. ¶¶ 52-53) and Goldberg and her employer (*id.* ¶ 25), the statements are "of and concerning" Goldberg as well. Goldberg does not claim that she has been harmed by Defendants' statements about her employer or Panova and does not bring this action on their behalf. Goldberg's defamation claims are based on allegations that Defendants made defamatory statements "of and concerning" her, and furthermore she has alleged that she has suffered harm as a result of these statements. *Id.* ¶¶ 71, 80-81.

### B.    The Statements are Not Non-Actionable Opinion

Defendants further argue that Goldberg cannot prevail because the allegedly defamatory

---

[4] Defendants do not dispute that the statements are intentional publications and have a "natural tendency to injure" or caused Goldberg special injury. *Herring*, 8 F.4th at 1157. The Court finds that Goldberg has alleged sufficient facts to satisfy these elements. *See* Compl. ¶¶ 20, 40-42, 71-73, 80-81.

United States District Court
Northern District of California

statements are either "truthful assertions of fact or non-actionable statements of opinion." ECF No. 28 at 26.[5] "Because the challenged speech must be a statement of fact" for the plaintiff to prevail in a defamation action, "the threshold question in every defamation suit is whether a reasonable factfinder could conclude that the contested statement implies an assertion of objective fact." *Herring*, 8 F.4th at 1157 (quotations omitted). Defendants assert that the statements at issue are "reflective" of their "subjective view on the issues under discussion," and not assertions of fact that can be proved or disproved. ECF No. 28 at 26. Although Defendants seem to imply that all statements of opinion are protected, this is incorrect. "A statement of opinion may be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Wilbanks v. Wolk*, 121 Cal. App. 4th 883, 902–3 (2004). Similarly, couching statements as rhetorical questions and conjecture "may be actionable if they convey false and defamatory information." *Id.* at 902. In determining if a statement is an assertion of fact or a nonactionable opinion or conjecture, courts examine the "totality of the circumstances" in which the statement was made and assess "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Herring*, 8 F.4th at 1157 (citations omitted).

While the tone of Defendants' online posts is conversational and freewheeling, the purpose of their channel is to provide information and advice to individuals seeking asylum. Compl. ¶¶ 11-14; *see* ECF No. 28 at 10-11. The September 2023 YouTube video begins with Defendants discussing a new "free service" to help their subscribers evaluate different immigration judges in the United States; they characterize their discussion of Goldberg as warnings to their subscribers. Compl. at 23. Although they blend this advice with opinions and commentary, a reasonable factfinder could conclude that their advice is rooted in objective fact rather than speculation. *See Herring*, 8 F.4th at 1157. Defendants use hyperbolic language, as well as figurative imagery, in

---

[5] Applying the 12(b)(6) standard, the Court accepts Plaintiff's allegations as true and does not determine whether particular statements Defendants made are true or false, only assessing if the statements are of the type that could be proven true or false.

their videos and social media posts. *See* Compl. ¶¶ 22, 24-26, 29-30, 41-43. Defendants describe Goldberg as a "Russian bear in the U.S."—figurative—and exclaim that she is violating "*all* personal data laws, international and others, leaking *all* the information to a hostile state"— hyperbole. *Id.* ¶¶ 30, 39 (emphasis added). But these metaphors and exaggerations do not negate the impression that Defendants are also asserting objective facts. *See Herring*, 8 F.4th at 1157. Moreover, "Where a communication is capable of two meanings, one defamatory and one not, it is for a jury, not a judge, to determine which meaning controls. […] at this stage of the case, a court's inquiry is not to determine if the communications may have an innocent meaning but rather to determine if the communication reasonably carries with it a defamatory meaning." *Miller v. Sawant*, 18 F.4th 328, 333 (9th Cir. 2021) (citations omitted).

Lastly, the allegedly defamatory statements are susceptible to be proven true or false. For example, Defendants' September 2023 video includes a summary stating that "Marina Sokolovskaya leaks personal data to a Russian deputy, who in turn is directly connected with Russia's security agencies. What case is currently being discussed in Russia, and who knows about it besides Marina and the intelligence services she works with?" Compl ¶ 24. The statement in the first sentence, that Goldberg "leaks personal data to a Russian deputy," is susceptible to be proven true or false. While the second sentence is couched in conjecture, Defendants' question implies an objective fact: Plaintiff leaks information about immigration cases to "intelligence services" in Russia. *Id.* Defendants' other statements phrased as hypothetical questions and conjucture—"what kind of conspiracy could there be, what kind of contract conditions could there be, that is, what other immigrants could she be sending there?" (*Id.* ¶ 26); "How [does] she violate[] all personal data laws, international and others, leaking all the information to a hostile state of one country or another? Maybe she is a double agent."  (*Id.* ¶ 30)—likewise imply that Plaintiff leaks immigrants' information to the Russian government. Whether or not Plaintiff sends information about asylees to the Russian government is "susceptible of being proved false" or true. *Weller v. American Broadcasting Co., Inc.*, 232 Cal. App. 3d 991, 1001 (1991).

Defendants argue that the statements here are akin to the statement at issue in *Herring*, where the Ninth Circuit found that a comment by Rachel Maddow made during an episode of her

talk show, that new channel One American News Network (OAN) "really literally is paid Russian propaganda" was non-actionable "rhetorical hyperbole." 8 F.4th at 1160 (citations omitted); ECF No. 32 at 19-20. While there is an obvious similarity between the two (both allegedly defamatory statements accuse the plaintiffs of a connection with Russia), context makes the instant case distinguishable from *Herring*. In the segment about OAN, Maddow commented on an article published by *The Daily Beast* that reported that one of OAN's employees was simultaneously employed by Sputnik News, a "Russian state-financed news organization." *Herring*, 8 F.4th at 1152. The article explained that a writer, Kristian Rouz, wrote as a freelancer for Sputnik News while he was employed at OAN, and that "Kremlin propaganda sometimes sneaks into Rouz's segments on unrelated matters [at OAN]." *Id.* Commenting on the article during her show, Maddow remarked:

> [A]mong the giblets the news gods dropped off their plates for us to eat off the floor today is the actual news that this super right wing news outlet that the president has repeatedly endorsed as a preferable alternative to Fox News .... We literally learned today that that outlet the president is promoting shares staff with the Kremlin.
> I mean, what? I mean, it's an easy thing to throw out, you know, like an epitaph in the Trump era, right? Hey, that looks like Russian propaganda. *In this case, the most obsequiously pro-Trump right wing news outlet in America really literally is paid Russian propaganda.*

*Id.* at 1153 (emphasis in original). Herring Networks, Inc. (Herring), which launched OAN, sued Maddow for defamation, claiming Maddow's statement that "[OAN] really literally is paid Russian propaganda" was false because "OAN has never been paid or received a penny from Russia or the Russian government." *Id.* Herring did not claim that the underlying article or Maddow's statement that OAN's employee was simultaneously employed at OAN and Sputnik News were false. Maddow described undisputed facts (that "OAN hired a Sputnik-employed writer") and then added her own commentary: "it's an easy thing to throw out, you know, like an epitaph in the Trump era, right? Hey, that looks like Russian propaganda. In this case, the most obsequiously pro-Trump right wing news outlet in America really literally is paid Russian propaganda." *Id.*

The Ninth Circuit held that because Maddow provided her audience with the truthful, factual basis for her comment—that a member of OAN's staff worked for a Russian news

organization while also working for OAN—her audience "could accept or reject Maddow's opinion based on their own independent evaluation of the facts" presented. *Id.* at 1160 (citations omitted). "An 'opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning.'" *Id.* at 1159 (quoting *Standing Committee on Discipline of the United States District Court for the Central District of Cal. v. Yagman*, 55 F.3d 1430, 1439 (9th Cir. 1995)). In contrast, here Goldberg claims the alleged underlying facts are false and injurious: she asserts that Katkov did not work for the Russian government when she contacted him, and she "has not shared any information about any person to the Russian government[,]" is "not a Russian agent[,]" and does not leak information about her asylee cases. Compl. ¶¶ 32, 45, 57; *see Flowers v. Carville*, 310 F.3d 1118, 1129 (9th Cir. 2003) (explaining that when a "speaker outlines the factual basis for his conclusion, his statement is protected," but this is predicated on "the factual basis itself [being] true. [...] A speaker can't immunize a statement that implies false facts simply by couching it as an opinion based on those facts"). As in *Flowers*, Plaintiff disputes the truth of Defendants' allegedly factual claims. Defendants' additional commentary is not "rendered nondefamatory merely because it relies on another defamatory statement." *Id.*

### C.    Plaintiff's Status as a Limited-Purpose Public Figure

Defendants argue that Goldberg is unlikely to prevail on her defamation claims because she is a public figure, and she will be unable to establish that Defendants acted with actual malice. Public figures must prove that the allegedly defamatory statements about them were made with "actual malice," that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80 (1964). For the foregoing reasons, the Court declines to find that Plaintiff is a public figure. [6]

For defamation purposes, a person can be a "general" public figure (who has "achieved such pervasive fame or notoriety that they become public figures for all purposes and in all contexts) or a "limited purpose" public figure who has "voluntarily" injected themself or been

---

[6] Because the Court finds that the Complaint does not show that Goldberg is a public figure, it does not reach the question of whether Goldberg has shown Defendants made the allegedly defamatory statements with actual malice.

14

United States District Court
Northern District of California

"drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Cabrera v. Alam*, 197 Cal. App. 4th 1077, 1091 (2011) (citations omitted); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). To determine if an individual is a "limited purpose public figure," courts employ a three-step test: they determine if "a public controversy existed" when the allegedly defamatory statements were made, if the plaintiff "voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution[,]" and if "the alleged defamation is related to the plaintiff's participation in the controversy[.]" *Makaeff*, 715 F.3d at 266.

In evaluating whether Goldberg is a limited-purpose public figure at this stage in the litigation, the Court considers only the allegations in the Complaint, attachments to the Complaint, and information subject to judicial notice. *See Toufanian v. Oreffice*, No. CV 19-7934, 2021 WL 4353115, at *4 (C.D. Cal. July 16, 2021) ("At the pleading stage, a determination of whether a plaintiff is a public figure is made from allegations in the complaint itself or from documents properly noticed."). Defendants' argument that Goldberg is a limited-purpose public figure focuses squarely on three paragraphs of Goldberg's Complaint.[7] ECF No. 28 at 22-23. According to these allegations, Goldberg "posts online about immigration and asylum and is affiliated with a law firm," she is the "face of her employer's social media marketing toward Russian asylum seekers," and she engages in volunteer efforts to search for missing persons. Compl. ¶¶ 16, 55, 62. Her Complaint further alleges that, separate from her work with the Modern Law Group, she has helped locate 120 missing individuals and made a documentary film about these volunteer efforts. Compl. ¶ 2.

The first step in evaluating if the target of alleged defamation is a limited-purpose public figure is to identify the existence of a specific public controversy that predates the alleged defamation. A matter is a public controversy if it is being "debated publicly"—as evidenced by

---

[7] Although Defendants also cite to Kiselev and Burtsev's declarations in support of this argument, ECF No. 23 at 28, the Court does not consider this evidence at the current stage in the proceedings. *See Planned Parenthood*, 890 F.3d at 834 ("[W]hen an anti-SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard").

media coverage, widespread attention, or the like—and if its "outcome […] affects the general public or some segment of it." *Planet Aid, Inc. v. Reveal*, 44 F.4th 918, 925 (9th Cir. 2022); *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980) ("[A] public controversy is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants."). A topic being of "general interest […] is not sufficient to create a public controversy." *Makaeff*, 715 F.3d at 267; *Time, Inc. v. Firestone,* 424 U.S. 448, 454 (1976) (holding that although a celebrity divorce "may be of interest to some portion of the reading public[,]" such type of "cause célèbre" is "not the sort of 'public controversy' referred to in *Gertz*") (italics added); *Wisk Aero LLC v. Archer Aviation Inc.*, No. 21-cv-02450, 2023 WL 3919469, at *11 (N.D. Cal. June 9, 2023) (finding no public controversy where the public was "interested" in aircraft technology but that "interest had not clearly ripened into an actual dispute") (quotations omitted).

In their anti-SLAPP motion, Defendants argue that "Plaintiff is, at minimum, a limited public figure under California law by virtue of her interjection into the public interest issues of immigration and search for missing persons, both of which are important issues within the Slavic refugee community[.]" [8] ECF No. 28 at 22. At the hearing, Defendants' counsel explained that the specific public controversy that Goldberg injected herself into is the issue of immigration consultants leaking information about Russian political asylees to the Russian government. The Court addresses these three topics turn.

a.    **Immigration**

Defendants first offer "immigration" as the public controversy that Goldberg has interjected herself into. ECF No. 28 at 22. The Court recognizes that immigration is a broad topic that is subject to widespread public debate and "affects the general public." *Planet Aid,* 44 F.4th at 925; Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable

---

[8] To the extent that Defendants' "at minimum" suggests that they are implying Goldberg could be an all-purpose public figure, the Court is unpersuaded. "Absent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society," an individual is not a public figure for all purposes. *Makaeff*, 715 F.3d at 265. None of the allegations in Goldberg's Complaint support an inference that that she enjoys "general fame or notoriety." *Id.*; *see* Compl.

United States District Court
Northern District of California

dispute [...]"). The Court is skeptical, however, that such an expansive topic qualifies as a "*particular* public controversy" in the limited-purpose public figure analysis. *Waldbaum*, 627 F.2d at 1292 (emphasis added). Cases evaluating whether an individual is a limited-purpose public figure typically identify a discrete conflict or question rather than overarching social issue. *See Makaeff*, 715 F.3d at 267 (identifying the public controversy as the "specific question of Trump University's legitimacy"); *Planet Aid*, 44 F.4th 918 at 925 (identifying the "genuine public controversies as Planet Aid and DAPP Malawi's misuse of charitable funds); *Resolute Forest v. Greenpeace*, 302 F. Supp. 3d 1005, 1017 (N.D. Cal. 2017) (identifying the public controversy as plaintiffs' record of "sustainable forestry practices" in the Boreal forest); *but see Mason v. Am. Prospect, Inc.,* No. CV 23-2238, 2024 WL 4345855, at *14 (D.D.C. Sept. 30, 2024) (finding that "gender equity" was a public controversy under *Waldbaum*'s three-part limited-purpose public figure analysis); *Anti-Defamation League of B'nai B'rith v. Superior Ct.,* 67 Cal. App. 4th 1072, 1089 (1998) (holding that "Israeli-Palestinian relations" constituted a public controversy).

Of course, the existence of a public controversy is only the first of three steps in the limited-purpose public figure analysis: for an individual to qualify as a limited-purpose public figure, they must have "thrust [themselves] into the vortex of [the] public issue" in an "attempt to influence its outcome." *Gertz*, 418 U.S. at 352; *Makaeff*, 715 F.3d at 267. The court in *Waldbaum* addressed the relationship between the scope of a public controversy and requisite role an individual must have or seek to have in it to be considered a limited-purpose public figure:

> We do not believe it necessary to state that a court should define the controversy "narrowly" or "broadly." A narrow controversy will have fewer participants overall and thus fewer who meet the required level of involvement. A broad controversy will have more participants, but few can have the necessary impact. Indeed, a narrow controversy may be a phase of another, broader one, and a person playing a major role in the "subcontroversy" may have little influence on the larger questions or on other subcontroversies. In such an instance, the plaintiff would be a public figure if the defamation pertains to the subcontroversy in which he is involved but would remain a private person for the overall controversy and its other phases.

*Waldbaum,* 627 F.2d at 1297, n.27.

Even if "immigration," referring to the movement of people to reside permanently in a

17

United States District Court
Northern District of California

1    foreign country, qualifies as a public controversy, the Complaint does not establish that Goldberg

2    has "thrust [herself] to the forefront [...] in order to influence the resolution of the issues

3    involved." *Gertz*, 418 U.S. at 345. As described in *Waldbaum*, where the controversy is a broadly

4    defined one with many participants, an individual must have a high "level of involvement" in the

5    controversy in order to "influence the resolution" of the controversy. *Id.*; *Waldbaum*, 627 F.2d at

6    1297, n.27. Goldberg's Complaint states that she works at an immigration law firm "to help

7    asylum seekers" obtain asylum in the United States and, as part of that role, posts information

8    about seeking asylum online. Compl. ¶¶ 2, 16, 62. Given that "immigration" is an exceptionally

9    broad issue and Goldberg's involvement is limited to posting online about specific sub-issues at

10   the direction of her employer, the Court cannot conclude that Goldberg "thrust [herself] to the

11   forefront" of the controversy "in order to influence resolution of the public issue" such that she

12   can be considered a limited-purpose public figure.[9] *Gertz*, 418 U.S. at 345; *Waldbaum, Inc.*, 627

13   F.2d at 1297; *Carver v. Bonds*, 135 Cal. App. 4th 328, 353 (2005). The Court therefore finds that

14   Goldberg is not a limited-purpose public figure in the context of immigration.[10]

### b.    The Search for Missing Persons

16          Defendants separately argue Goldberg is a limited-purpose public figure relating to the

17   search for missing Russian, Ukrainian, and Belarusian dissidents. ECF No. 28 at 22. The Court

18   finds that Goldberg is not a limited-purpose public figure in this context, although for different

19   reasons. Goldberg's Complaint alleges that she engaged in "active volunteer efforts to help find

20   missing persons," has located and identified "more than 120 missing persons," and created a

21   documentary film about these efforts. Compl. ¶¶ 2, 55. Assuming that a public controversy over

22   missing persons from these regions exists, the Court finds these allegations are sufficient to show

23

24   ───────────────

[9] To find otherwise would risk reanimating *Rosenbloom*. *See Rosenbloom v. Metromedia, Inc.*,
25   403 U.S. 29, 44, (1971) (extending the actual malice requirement to "all discussion and
     communication involving matters of public or general concern, without regard to whether the
26   persons involved are famous or anonymous."), *abrogated by Gertz*, 418 U.S. at 323.
     [10] The Court also doubts that, absent evidence that Goldberg was engaged in "large scale,
27   aggressive advertising," her "social media marketing" for her employer meets "the requirement for
     voluntarily participating in a controversy." Compl. ¶ 62; *Makaeff*, 715 F.3d at 267; *Hu & Assocs.,*
28   *LLC v. New Life Senior Wellness Ctr., LLC*, No. LA CV16-03078, 2017 WL 10591754, at *17
     (C.D. Cal. July 7, 2017); *see Toufanian v. Oreffice*, 2021 WL 435115, at *4.

that Goldberg "voluntarily injected [herself] into the controversy for the purpose of influencing" its outcome. *Makaeff*, 715 F.3d at 266.

Defendants' argument fails at the third step of the limited-purpose public figure analysis. For a plaintiff to be a limited purpose public figure with respect to a particular controversy, the alleged defamation must be "related to the plaintiff's participation in the controversy." *Makaeff*, 715 F.3d at 266. Goldberg claims to have been defamed by Defendants' statements that she shares information about political asylees with the Russian government, including that she "leaks personal data to a Russian deputy, who in turn is directly connected with Russia's security agencies," provides "personal data to the Russian authorities about people who immigrate to the United States," and that "it turns out that there is a person in the U.S. who collaborates as an infiltrated agent from Russia and transmits this data and also tries to influence the situation in such a way that the people whom the U.S. is protecting now should be deported." Compl. ¶¶ 24, 25, 38. The alleged defamatory statements do not relate to Goldberg's volunteer efforts searching for missing persons or publicity concerning these efforts. While Goldberg may have "invited public comment and debate" about the search for missing persons by making a documentary on the subject, it does not follow that she invited "public comment and debate" about leaking information to the Russian government from individuals in the U.S. *See Grishin v. Sulkess*, No. CV 18-10179, 2019 WL 4418543, at *6 (C.D. Cal. May 31, 2019). The Court accordingly finds that Plaintiff is not a limited purpose public figure related to the search for missing persons.

### c.      Immigration Professionals Leaking Information to the Russian Government

At the hearing, Defendants' counsel clarified that the specific public controversy that Goldberg injected herself into is immigration consultants leaking information about Russian political asylees to the Russian government. The Court recognizes that this type of issue could conceivably be the subject of public discourse. However, the Complaint does not establish that this is an actual controversy that was the topic of public debate prior to the alleged defamation. In evaluating if an issue is being publicly debated, courts consider "if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public

19

1    formulate some judgment" or if the topic is otherwise part of public discourse. *Waldbaum*, 627

2    F.2d at 1297; *see Makaeff*, 715 F.3d at 267 (having "little difficulty in concluding that a public

3    controversy existed over Trump University's educational and business practices" where "Trump

4    University's legitimacy" was being debated on "public Internet message boards" and in a

5    newspaper column); *Planet Aid v. Reveal*, 44 F.4th at 925 ("We have little difficulty in concluding

6    that genuine public controversies existed [. …] Long before [Defendants] published any articles

7    about Planet Aid, countless news outlets published articles questioning Planet Aid's integrity and

8    examining the extent to which its charitable funds were being used for their intended purposes.");

9    *Nadel v. Regents of Univ. of Cal.*, 28 Cal.App.4th 1251, 1255, 1269-70 (1994) (finding that the

10   planned development of a park in Berkeley, California, was a public controversy as there were

11   "active and vocal opponents" of the development who spoke out against it at "city council

12   meetings and public demonstrations" and the dispute was covered by the print media); *Resolute*

13   *Forest Products, Inc.*, 302 F. Supp. 3d at 1017 (finding that plaintiffs' forestry practices were a

14   public controversy based on allegations of large scale demonstrations and petitions about the

15   practices).

16           Here, the Complaint does not allege that there was any public debate or media coverage

17   about immigration consultants leaking information to the Russian government before Defendants

18   made their allegedly defamatory posts. *See* Compl. While Goldberg alleges that Defendants'

19   videos were watched by thousands of viewers and resulted in public Facebook posts warning that

20   she was a "Kremlin agent," this controversy was created by Defendants and does not show that

21   there was a broader, preexisting public debate about asylees' information being leaked to the

22   Russian government. Compl. ¶¶ 40, 54-55. The Court finds that allegations in the Complaint to not

23   show that the issue of Russian asylees' information being leaked to the Russian government was a

24   genuine public controversy and declines to find that Goldberg is a limited-purpose public figure as

25   to this topic.

26           The Court accordingly finds that Goldberg is not a limited-purpose public figure. This

27   ruling is without prejudice and Defendants may renew this claim on summary judgment if they

28   present evidence that there is an actual public controversy that "received public attention" and

United States District Court
Northern District of California

20

"was being debated publicly" prior to Defendants' statements, that Goldberg voluntarily injected herself "into the controversy for the purpose of influencing the controversy's ultimate resolution," and that the allegedly defamatory statements were "related to [Goldberg's] participation in the controversy." *Waldbaum*, 627 F.2d at 1297; *Planet Aid, Inc. v. Reveal*, 44 F.4th at 924.

### D.    Defendants' Asserted Privileges Are Inapplicable

Defendants argue that Goldberg cannot prevail on her claims because their statements about her are protected by the common interest privilege, the fair comment privilege, the litigation privilege, and the *Noerr-Pennington* doctrine. *See* ECF No. 28 at 18-21. These privileges are inapplicable here.

### 1.    Common Interest Privilege

Under California law, communications between people who share a common interest made to "protect or further" the common interest may be privileged. *Family Home & Finance Center, Inc. v. Federal Home Loan Mortg. Corp.*, 461 F. Supp. 2d 1188, 1197 (C.D. Cal. 2006). California Civil Code section 47(c)(1) specifies that publications made "In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information" are privileged. The common-interest privilege codified by section 47(c)(1) "has been found to apply where the interest is something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest." *Henley v. Jacobs*, No. C 18-2244, 2018 WL 10604528, at *3 (N.D. Cal. Dec. 21, 2018) (citations omitted). Such qualifying relationships include those "between partners, corporate officer and members of incorporated associates," "between union members and union officers," and extend to the relationships between "members of religious, fraternal, charitable, or other non-profit associations." *Hicks v. Richard*, 39 Cal. App. 5th 578, 586 (2019).

Defendants claim that their statements regarding Goldberg are protected by the common interest privilege because Defendants were "communicating with persons sharing a common

1    interest in U.S. immigration and asylum issues." ECF No. 28 at 19. Goldberg counters that the

2    common interest privilege is inapplicable here, as it only applies "to statements disseminated to a

3    limited, interested group, not to statements posted online for anyone to access." ECF No. 31 at 18.

4         As Plaintiff correctly notes, the common interest privilege does not apply to publications

5    by the "news media to the general public," even if the general public is interested in the topic. *Id.*;

6    *Kashian v. Harriman*, 98 Cal. App. 4th 892, 914 (2002); *see generally, Brown v. Kelly*

7    *Broadcasting Co.*, 48 Cal.3d 711, 736-37 (1989) (finding that the common interest privilege does

8    not apply to publications made by news media). Although Defendants' YouTube and Instagram

9    accounts are not news media in the traditional sense, the reasoning that precludes the common

10   interest privilege from applying to news publications is equally applicable here. Defendants' social

11   media channels are publicly available, their YouTube channel alone has over "100,000 followers

12   and nine million views," and the videos containing the allegedly defamatory statements have been

13   viewed thousands of times. *See* Compl. ¶¶ 11, 14, 40. While the viewers and subscribers likely are

14   interested in "immigration and asylum issues," there is no indication that they have close

15   professional, employment, or business relationships with Defendants of the type that would

16   warrant application of the common interest privilege. ECF No. 28 at 1; *see Henley v. Jacobs*, 2018

17   WL 10604528, at *3.

18        In *Hicks v. Bradford*, the defendant posted defamatory statements on a neighborhood's

19   crime awareness Facebook page and then claimed the statements fell under the common interest

20   privilege because he and other followers of the page shared a common interest in "crime

21   awareness, prevention, and safety" in the neighborhood. The Central District found that such a

22   "broad and generalized" common interest "is not the type of protectable interest that will support a

23   common interest privilege defense." No. CV 21-7330, 2022 WL 20689541, at *6 (C.D. Cal. Dec.

24   13, 2022). As in *Hicks*, although Defendants and their subscribers may share a common interest in

25   immigration and asylum issues in the colloquial sense, this interest is too generalized to be

26   protected by the common interest privilege. *Id.*; *see New Show Studios LLC v. Needle*, No. 14-cv-

27   01250, 2014 WL 12495640, at *14 (C.D. Cal. Dec. 29, 2014) (finding that although defendants

28   and recipients of their online communication "likely shared a 'common interest' as that term is

United States District Court
Northern District of California

22

used colloquially, they did not share the relationship necessary to render defendants' statements privileged within the meaning of section 47(c)"). Defendants' allegedly defamatory statements are not covered by the common interest privilege.

### 2.     Fair Report Privilege

Defendants next assert that their statements are protected by the "Fair Comment Privilege" as codified by California Civil Code 47(d). ECF No. 28 at 19. Defendants appear to be referring to the fair report privilege under California Civil Code section 47(d), rather than the fair comment privilege. *See McClatchy Newspapers, Inc. v. Superior Court*, 189 Cal. App. 3d 961, 974-75 (1987). "The fair report privilege confers an absolute privilege on any fair and true report in, or a communication to, a public journal" about judicial, legislative, or other public official proceedings. *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (2017) (quotations omitted); *see* Cal. Civ. Code § 47(d). For the privilege to apply, the allegedly defamatory statements must 1) report about the contents of a judicial or other public proceeding, 2) be a fair and accurate report of the proceeding, and 3) be published in or made to a public journal. *Id.*

Defendants allege that the fair comment privilege applies because Defendants discussed "the details of Kiselev's legal case in Russia," communications between Katkov and Kiselev's attorney, and "Plaintiff's conduct before and during […] asylum hearings" in the videos that contain the allegedly defamatory statements. ECF No. 28 at 20. While the transcripts of the videos indicate that Defendants discussed Kiselev's ongoing case in Russia and that Katkov allegedly spoke to Kiselev's attorney after a court hearing, they did not report about what occurred in court proceedings. Compl. at 23-24 ("I [Kiselev] have attorneys working in Russia […] we are in an active phase of these cases […] this person [Katkov], after another court session, approached my defense and said the following: 'I suggest you close the case with Ilya Kiselev.'"). Nor do they report about any asylum proceedings. The fair report privilege protects reporters and their sources from liability for accurately reporting about what occurred in court or other official proceedings— it does not extend to all statements that acknowledge the existence of a court proceeding. *See Wisk Aero LLC v. Archer Aviation Inc.*, No. 21-CV-02450, 2023 WL 3919469, at *6 (N.D. Cal. June 9, 2023) (explaining that "the purpose of California law" is to provide "breathing room for

United States District Court
Northern District of California

newspapers to explain the basis of a judicial proceeding without at the same time opening

themselves up to exposure for defamation liability") (quoting *Dorsey v. Nat'l Enquirer, Inc.*, 973

F.2d 1431, 1437 (9th Cir. 1992)).

But even if Defendants' discussion of Kiselev's court proceedings in Russia constitute

communications about judicial or other official proceedings, the privilege is inapplicable because

Plaintiff does not claim that Defendants' statements about judicial proceedings are defamatory.

Rather, she claims that Defendants' statements that she leaks her clients' information to the

Russian government and is a "double agent" are defamatory. *Id.*; *see* Compl. ¶¶ 20, 22, 24-27, 29-

30, 38-39, 41-43, 48-53. Defendants' comments about these topics are plainly outside the scope of

the fair report privilege.

### 3.    Litigation Privilege

Under California law, statements made "in a judicial proceeding, or in the initiation or

course of any other proceeding authorized by law," including arbitration and mediation

proceedings, are privileged. *Makaeff*, 715 F.3d at 264 (citing Cal. Civ. Code § 47(b)). "The

privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by

litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4)

that have some connection or logical relation to the action." *Id.* (quoting *Silberg v. Anderson,* 50

Cal.3d 205, 266 (1990)).

Defendants assert that their "allegedly defamatory comments had a direct relationship to

Kiselev's and other Russian immigrants' asylum cases filed or pending before U.S. immigration

courts" and thus are covered by the litigation privilege. ECF No. 28 at 21. This argument is

unpersuasive. First, it is not enough that the defamatory statements were "related" to litigation;

they must have been made during the course of judicial or quasi-judicial proceedings to "achieve

the objects of the litigation." *Makaeff*, 715 F.3d at 264. Second, Goldberg does not allege that

Defendants' comments about Kiselev's and other immigrants' asylum cases were defamatory, but

rather that their statements regarding her alleged relationship with the Russian government were

defamatory. *See* Compl. ¶¶ 25-42. As none of the allegedly defamatory statements were made in a

judicial or quasi-judicial proceeding, the litigation privilege does not apply.

#### 4.    *Noerr-Pennington* Doctrine

Similarly, Defendants claim that the *Noerr-Pennington* doctrine applies because the alleged defamatory statements "directly address Defendants' and/or other asylees and/or Defendants' subscribers' petitioning activity, particularly in the U.S. immigration courts." ECF No. 28 at 21. The *Noerr-Pennington* doctrine "provides that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 643–44 (9th Cir. 2009) (citations omitted).[11] It appears that Defendants are claiming that their own and other asylees' asylum applications are protected "petitioning activity." The *Noerr-Pennington* doctrine is inapplicable here as Goldberg is seeking to hold Defendants liable for their statements about her alleged ties to the Russian government, not their conduct relating to their asylum applications or any petitioning activity.

The Court accordingly finds that none of the privileges Defendants assert are applicable. As the Complaint does not contain factual allegations to support that Goldberg is a public figure and does contain sufficient factual allegations to support her claims for defamation *per se* and *per quod*, the Court finds that Goldberg has met her burden at the second step of the anti-SLAPP analysis and "stated a claim for defamation under California law." *CoreCivic v. Candide*, 46 F.4th at 1143.

#### E.    Request for Attorney's Fees

California law specifies that "if the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." Cal. Civ. Proc. Code § 425.16(c)(1). Goldberg claims that Defendants' motion is frivolous and requests an award of costs and attorney's fees. ECF No. 21 at 24. While Defendants' arguments were unavailing at this stage, their motion was not so "totally devoid of merit" as to be frivolous. *Moore v. Shaw*, 116 Cal. App.

---

[11] Goldberg incorrectly claims that the *Noerr-Pennington* doctrine only applies in the antitrust context. ECF No. 31 at 22-23. *Kearney* clarifies that this not the case: while the doctrine "initially emerged in the antitrust context […] The Supreme Court has since held that *Noerr-Pennington* principles apply with full force in other statutory contexts outside antitrust." 590 F.3d at 644 (citations omitted).

United States District Court
Northern District of California

4th 182, 200 (2004). Goldberg's request for attorney's fees and costs is denied.

## V.    CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Strike and DENIES' Goldberg's request for attorney's fees.

**IT IS SO ORDERED.**

Dated: January 24, 2025

_____
LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California